382 So.2d 238 (1980)
H. C. HOBBS et al., Plaintiffs-Appellants,
v.
CENTRAL EQUIPMENT RENTALS, INC., et al., Defendants-Appellees.
No. 7490.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1980.
Rehearing Denied April 25, 1980.
*240 J. Phil Haney, New Iberia, for plaintiffs-appellants.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Herman E. Garner, Jr., Lafayette, Daniel Nail, Napoleonville, Plauche, Hartley, Lapeyre & Ottinger, Patrick S. Ottinger, Lafayette, for defendants-appellees.
Before DOMENGEAUX, FORET and SWIFT, JJ.
FORET, Judge.
The basic facts upon which this lawsuit is based were succinctly set out by the trial court and we take the liberty of quoting therefrom:
"On November 6, 1974, the plaintiffs filed this suit against Central Equipment Rentals, Inc., Sam Hance and Bonnie Rose Crawford Hance, seeking $329,811.86, alleging that they were the owners of a two-thirds interest in a mineral lease executed by the St. Martin Land Company on June 20, 1950. They claim that the defendants arranged for the removal of certain property and equipment located on three wells affected by this lease belonging in part to the plaintiffs and in part to the defendants, and converted the materials to their own use, which had a value insofar as the two-thirds interest of the plaintiffs is concerned of the amount claimed.
"The defendants brought into this lawsuit Fred Setoon and Condor Pipe Company but after the trial on the merits, by consent they were dismissed from the case.
"The defendants filed an answer on April 14, 1975, and a reconventional demand alleging that it was necessary to employ certain parties to salvage the three wells and clean them up, and that the defendant paid $19,951.60 for this, as well as $2,024.82 to the tax collector of St. Martin Parish for the 1973 ad valorem taxes, showing that Mrs. Hance, a defendant, was in partnership with the two Hobbs plaintiffs, and she spent that money on their account and should be reimbursed by them in the amount of two-thirds of the money spent."
The trial court rendered judgment in favor of defendants-appellees granting their reconventional demand and against plaintiffs-appellants, rejecting their claims. From this judgment, plaintiffs have appealed.
The record shows that the two Mr. Hobbs, and the former husband of Mrs. Hance, W. D. Hance, were partners in the operation of three oil wells located on state leases covering the bed of Lake Henderson, Plumb Bob Field, St. Martin Parish. There was no written partnership agreement and no written management or operating agreement between the parties. W. D. Hance was the owner of Central Equipment Rentals, Inc. (hereinafter Central) until his death. W. D. Hance had acquired his 1/3 interest from Central by virtue of an assignment. Although there is no written evidence of record as to a transfer by Central to W. D. Hance, it is undisputed that the interest was in fact vested in Mr. Hance individually. Upon Mr. W. D. Hance's death, his interest was inventoried in his succession, and his widow, Bonnie Rose Hance, was placed in possession of the succession. Mrs. Hance later executed a general power of attorney to her son, Sam Hance, authorizing him to conduct her business affairs. In addition, Sam Hance was named as president of Central.
There was an unwritten agreement between these parties similar to, if not identical to, the agreement which existed between Mrs. Hance's former husband, W. D. Hance and the two Hobbs. Essentially, the agreement was that Mr. Hance was to provide a laborer to work on the wells, in addition to his share of the financial expenditures *241 relating to the operation of the wells. The Hobbs were to maintain the wells and perform any related activities which were required from time to time to keep the well or wells in the proper working condition, the basis for this agreement being the Hobbs' expertise in this particular area of oil and gas production. Mr. W. D. Hance, on the other hand, was not an expert and had a limited amount of knowledge in this field. The three partners shared equally in any and all profits. As stated before, the Hobbs brothers performed the physical work on the wells and H. C. Hobbs also drew a salary as a consultant from the partnership for work done on the wells. Only one of the three wells actually produced income for the partnership. The proceeds from the production of the well were deposited into an account and all costs and expenses were drawn on that account. A Mr. Marion Rizzuto was employed by the partnership to keep its records and accounts.
Some time in February of 1973, the producing well ceased production. Subsequent attempts to re-work the well were unsuccessful, and the partners decided to end their joint operations and plug the well. The record shows that Central Equipment Rentals, Inc. had been designated as operator of the well on Department of Conservation records. Chevron Oil Company, the original lessee and assignor of the mineral leases to Central and the Hobbs, subsequently made demands on the lessees, in particular, Sam Hance, to clean, plug and abandon the wells pursuant to their legal obligations set out in the original leases and assignments.
It was agreed between the partners that it would be necessary to perform their legal obligations and to have the wells plugged and abandoned. H. C. Hobbs procured a bid from one W. L. Estis to plug and abandon the wells, dismount the derricks and production platforms, and pull all pilings. The Estis bid was for $49,435.00, plus the salvage rights to all of the recoverable downhole and surface equipment. Based on Mr. Hobbs' opinion, this bid was rejected by the partners as being too high. This was done at a meeting held in September of 1973.
From this juncture, communications began to deteriorate between the parties, in particular, the Hobbs and Mrs. Hance and/or her representative, Sam Hance. It is undisputed that it was agreed between all parties that each would actively seek bids for the plugging and abandoning of these wells being that the Estis bid was rejected. Complications arose when the Hobbs Brothers informed Mrs. Hance that they were not financially able to and would not contribute to the clean-up operations. That being the case, Sam Hance took it upon himself to find a contractor or contractors to perform the necessary work. Subsequently, Sam Hance entered into contracts with Condor Pipe Company (hereinafter Condor), Setoon Oil Field Contracting Company (hereinafter Setoon), and McBroom Rig Building Service, Inc. (hereinafter McBroom).
Setoon was to pull the pilings, unload the derrick, and pick up flow lines. The bid given by Setoon for their services was $16,462.60, which bid was ultimately accepted. Condor agreed to assist in the pulling of the pipe and dismantling of the platforms, and their consideration was that they would get the salvage pipe and equipment without any cost to Mrs. Hance other than the cost of the dismantling of the rig, which was done by McBroom for the sum of $3,489.00. Ultimately, Setoon, Condor, and McBroom performed their services pursuant to the contracts they had entered with the Hances, i. e., the wells were plugged and abandoned, surface casing was removed, and some production pipe was salvaged. Up until this point, all parties seemed to be content with the operations as they had been performed. Mrs. Hance was somewhat disgruntled with the Hobbs in that they failed to contribute their share of the expenses in having the wells plugged and abandoned; however, she testified that she had no intention of taking any legal action against them since she felt sorry for them and was willing to consider the matter closed.
*242 Along about this time, the mid-east oil embargo occurred. The price of oil field equipment escalated swiftly and dramatically. Pipe and casing were in particular demand.
As the trial judge stated:
"The crux of this lawsuit is the contention of Mr. Hobbs that had they been allowed to dismantle the rigs, pull the casing and plug and clean up the lease themselves, they could have sold the salvage for a tremendous amount of money."
Against this factual background, the trial court rejected the plaintiffs' claim and granted the Hances' reconventional demand. The trial court was of the opinion that the salvageable equipment did not have much, if any, value compared to the work that would be necessary to salvage it. We agree. The court went on to base its ruling on several Civil Code articles, which it felt to be applicable, in particular, those relating to quasi-contracts (negotiorum gestio) and partnership. We will address appellants' assignments of error individually in an attempt to clearly delineate the issues in reviewing this matter.
ASSIGNMENT OF ERROR # 1.
Appellants state in their first assignment of error that:
"The trial court erred in allowing the respondent-appellees to present verbal or parol evidence concerning the appellants' rights and obligations as assignees of two mineral leases to plug, abandon, and salvage three well sites. Since La.R.S. 9:1105, which was in effect at the time of the alleged conversion and presently under La.R.S. 31:18, the law clearly classifies these rights and obligations affecting mineral leases as incorporeal immovable rights and thus, requiring written instruments or written proof of any transaction involving these rights and obligations under Louisiana Civil Code Article 2276."
This assignment has merit only if the rights and obligations of the parties are immovable within the contemplation of former LSA-R.S. 9:1105, now LSA-R.S. 31:18.
The contracts in dispute were for the removal of equipment from and the plugging of defunct oil wells. The contracts in no way purported to affect any rights or title to the mineral leases per se. The equipment used to extract the oil from the reservoir was not so situated as to be of a permanent nature. The equipment would have to be removed as soon as the wells ceased producing in paying quantities and were abandoned. The contracts involved in this litigation have a single object; the removal of production equipment from and the plugging of non-producing wells.
In Hawthorne Oil and Gas Corp. v. Continental Oil Co., 377 So.2d 285 (La.1979), our Supreme Court held that a contract to purchase natural gas was a contract to sell a movable, since delivery was to take place after the gas left the wellhead. In the present case, like in Hawthorne, delivery took place upon severance of the thing. As evidenced by the very nature of the contract between the Hances, Setoon and Condor, the equipment was viewed as being movable. The contracts were for the abandoning and plugging of non-producing wells and for the removal of the sub-surface and surface equipment.
A written contract is not a necessary requisite for the sale of movables. LSA-C.C. Article 2441.
Weldon Dufrene, the manager of the Lafayette office of Condor at the time the contract in question was negotiated, testified that:
". . . a lot of wells are plugged over a telephone conversation."

* * * * * *
"A company may call a company who has done business with a plugging contractor, may call the plugging contractor and plug a well without any contracts or any research being done to the well. They may tell them what's in the well, what they could retrieve; and everything is verbal and over a telephone conversation and surmise [sic] as that." (Tr.rec., pg. 886)
*243 In our opinion, these contracts would have at most only an incidental effect on immovable property. Cf. Hawthorne, supra, i. e., removal of certain movable equipment, etc. from immovable property.
The contracts involved had nothing to do with the mineral lease itself, other than being made in furtherance of a mandatory provision therein, which required the lessees to abandon, plug, and remove from the site all equipment, etc. following the abandonment of a well for non-profitable production. Other than that, the various verbal agreements between the parties had nothing to do with leasing, transfer of mineral interest, altering the original lease, or anything else which would affect immovable rights directly or indirectly.
ASSIGNMENT OF ERROR # 2.
Appellants assign as error the trial court's allowing the defendants-appellees to present parol evidence to modify or alter the terms and persons obligated by the written contract between Condor and defendants-appellees, and the written contract between Setoon and defendants-appellees. We find this assignment without merit. The parol evidence rule applies only to actions between the parties to an act or contract and their privies, and not to actions between the parties and third persons. Chenevert v. Lemoine, 161 So.2d 85 (La.App. 3 Cir. 1964), writ refused, 245 La. 1076, 162 So.2d 572 (1964); Ewell v. Giamanco, 139 So. 515 (La.App. 2 Cir. 1932).
We conclude therefore that parol evidence was properly admitted. None of the actual parties to the contracts in question objected to the admission of parol evidence. The only objections lodged were made by the plaintiffs-appellants, and as noted before, they were not parties to the contracts in question.
ASSIGNMENTS OF ERROR # 3 AND # 4.
Plaintiffs-appellants allege that the trial court erred in applying Civil Code Articles 2292, 2298, 2868, and 2862 since the acts of the defendants-appellees in contracting to alienate the wellsite equipment went beyond the powers of an administrator and further erred in applying the partnership article since we are dealing with immovable property, thus requiring the partnership to be in writing and any transactions of the partners to be in writing. Appellants cite as authority Civil Code Articles 2836 and 2870. Additionally, appellants allege that the trial court erred in finding that Sam and Bonnie Hance were prudent administrators.
As previously noted, these contracts in question do not involve immovables, but instead involve movable property. For this reason, assignment of error # 3 is without merit.
We think, as did the trial court, that the actions of Mrs. Hance are governed by the Civil Code articles relating to quasi contracts. LSA-C.C. Article 2292 reads:
"Certain obligations are contracted without any agreement, either on the part of the person bound or of him in whose favor the obligation takes place.
Some are imposed by the sole authority of the laws, others from an act done by the party obliged, or in his favor.
The first are such engagements as result from tutorship, curatorship, neighborhood, common property, the acquisition of an inheritance, and other cases of a like nature.
The obligations, which arise from a fact, personal to him who is bound, or relative to him, result either from quasi contracts, or from offenses and quasi-offenses."[1]
*244 Quasi contracts arise without agreement from the lawful and purely voluntary act of a man from which there results any obligation whatever to a third person, and sometime a reciprocal obligation between the parties. LSA-C.C. Articles 2292, 2293, 2294. The essential elements of quasi contracts are a benefit conferred on the defendant by the plaintiffs, an appreciation by defendant of such benefits, and acceptance and retention by the defendant of such benefits under circumstances such that it would be inequitable for him to retain the benefits without payment of the value therefor. Teche Realty & Investment Co., Inc. v. A.M.F., Inc., 306 So.2d 432 (La.App. 3 Cir. 1975), writ denied, 309 So.2d 681 (La.1975).
Once a quasi contract is formed, Civil Code Article 2298 gives the standard to which the negotiorum gestor is held in the management of the affairs of another. LSA-C.C. Article 2298 states in pertinent part:
"In managing the business, he is obliged to use all the care of a prudent administrator."
We are of the opinion that the Hances did exactly what a prudent administrator would have done. Upon learning that the Hobbs were unable or unwilling to contribute to the clean-up operations, they took it upon themselves to locate contractors with the necessary expertise to perform the cleaning, plugging and abandoning of the wells. This was done at a minimal cost, as can be seen by comparison to the first bid which was submitted by W. L. Estis. Mr. Setoon himself said that had he known beforehand that the operation would involve all that it did, he would not have entered the contract with the Hances for the amount of $16,462.60. He testified further that in his estimation he lost approximately $14,000.00 on that operation. We find that the evidence is convincing that it would have been a losing proposition for the Hobbs to have salvaged the equipment themselves. As noted previously, Mrs. Hance was content to pay the entire amount of the cost of the clean-up operations without any recourse against the Hobbs.
Mrs. Hance was in the position of a partner with regard to the wells in question. LSA-C.C. Article 2868 states:
"When several partners are intrusted with the administration without their duties being pointed out, or when it is not expressed that one shall not be able to act without the other, they may do separately all the acts relating to such administration."
It is clear from the record that the duties of the partners were not clearly delineated. Each partner was therefore empowered or free to act on behalf of the partnership with regard to the administration of the partnership business. The record shows Mrs. Hance was of the belief that she could expect no help, financial or otherwise, from the Hobbs in having the wells plugged and abandoned. She was therefore empowered to act on behalf of the partnership of her own volition. LSA-C.C. Article 2862 provides that:
". . . no partner shall be held liable for any loss which has happened in consequence of any thing bona fide done or omitted by him in the legal exercise of his power, either as administrator or partner, although such act or omission should be injudicious and injurious to the partnership."
Mrs. Hance's actions were both bona fide and those of a prudent administrator. Not only were they prudent and bona fide, but they were not injudicious or injurious to the partnership. Mrs. Hance acted in what was at the time a very fair manner. For these reasons, assignment of error # 4 is without merit.
ASSIGNMENT OF ERROR # 5.
Plaintiffs-appellants urge in this assignment of error that Central and Sam Hance were not proper parties to this suit. A resolution of this issue is not necessary for the decision of this case. Whether or not
*245 Central and Sam Hance are proper parties to this suit is of no moment since the ultimate decision of this Court will be in favor of Mrs. Hance.
ASSIGNMENT OF ERROR # 6.
The final contention of plaintiffs-appellants is that the court erred in finding that they failed to establish the value of the equipment allegedly converted. Again, the resolution of this issue is not pertinent to the case at bar since we have rejected plaintiffs-appellants' demand and will affirm the judgment of the trial court.
For the above and foregoing reasons, the judgment of the trial court is affirmed.
All costs herein are assessed to the plaintiffs-appellants.
AFFIRMED.
NOTES
[1] We observe in passing that C.C. Article 2292 apparently contains at least three errors in the English translation of the French text. The word "contracted" in the first paragraph of Article 2292 should be "formed", and the words "common property" in the second paragraph should be "co-ownership". See editorial comments under Article 2292 Translation of RCC 1870.

See also Dean v. Hercules, Inc., 314 So.2d 430 (La.App. 1 Cir. 1975), reversed on other grounds, 328 So.2d 69 (La.1976), which held that in the third paragraph an error of translation occurred in that the word "fact" is better translated from the original French "fait" as "act". In other words, the word "fact" should be "act".